**Opinion issued March 31, 2022.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-20-00213-CR**

———————————

**ROBERTO MEDINA FLORES, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 10th District Court**
**Galveston County, Texas**
**Trial Court Case No. 17CR0756**

## MEMORANDUM OPINION

A jury convicted Appellant Roberto Medina Flores of the second-degree felony offense of sexual assault. Appellant pleaded true to an enhancement paragraph, and the trial court assessed Appellant's punishment at fifteen years' confinement in the Texas Department of Criminal Justice, Institutional Division.

Appellant raises five points of error. In his first point of error, he contends the evidence was legally insufficient to support his conviction for sexual assault because the State failed to prove scienter. In his second point of error, Appellant argues the trial court abused its discretion in denying his motion for new trial because the judge's comments during voir dire violated his Fifth Amendment right not to testify at trial and to the presumption of innocence. In his third and fourth points of error, Appellant asserts he was denied effective assistance of counsel during the guilt-innocence phase of trial because his counsel failed to investigate available witnesses and seek a forensic examination of the complainant's video/audio recorded statement to law enforcement. In his fifth point of error, Appellant asserts the trial court erred in considering extraneous evidence outside the record in denying his motion for new trial. We affirm.

## Background

In August 2014, the complainant, Megan Beck ("Beck"), left Houston and moved to Galveston where she began working at one of the shops on The Strand in Galveston called at Lapalapa. Lapalapa's owner owned several other nearby shops, including Bunch A' Cool Stuff, and his employees typically worked among the different shops. Appellant worked at Bunch A' Cool Stuff and Gizmos's Bar.

Appellant visited the shop where Beck worked on occasion. Beck testified Appellant was "very flirtatious" and "always acted like he was into me." Appellant

2

would tell Beck "he wanted to sleep with [her]" and "wanted to go out with her, different things like that." Beck repeatedly told Appellant she was not attracted to him, did not like him, and "wanted nothing to do with that every time." At the time, Beck was twenty-one years old and Appellant was thirty-four years old and had a young child. Beck testified she "had no interest in anybody that much older who had a child and everything else."

While working at Lapalapa, Beck met Landers Weakley ("Weakley"), who worked at a cigar store at The Strand and lived in a loft above Lapalapa. Beck and Weakley became friends and eventually started dating. Beck testified she and Weakley saw each other a couple of times a week. She testified she "really didn't drink" until she turned twenty-one and did not drink "that often." She would hang out with Weakley and they would have a few drinks together, "[m]ostly whiskey."

On December 21, 2014, Beck planned to meet Weakley after her shift at work and going home to walk her dog. Weakley got off work first and walked a few blocks to his loft. Weakley told Beck "he needed to take a nap" and she agreed to "meet up with him once [she] got back from hanging out with [her] dog." When Beck's shift ended, she ran into Appellant who suggested they get a drink "down the street" where Appellant's co-worker, Vlad, was bartending. Appellant and Beck went to Bobby's House of Spirits on The Strand. Beck drank a couple of glasses of whiskey and three shots—a fireball, a liquid marijuana, and a third unknown shot.

She testified she went to the bathroom and, upon returning, she saw a third shot sitting on the bar and she drank it. Beck testified she had never had drinks with Appellant before that day.

Beck testified Appellant was "very flirtatious" with her at the bar and told her "to give him a chance." Beck replied that she "wasn't interested whatsoever." At one point, Appellant touched Beck and "put his hand towards [her] vagina over [her] jeans." Beck pushed Appellant away and "told him not to do that." Beck testified Appellant complied and "just kind of laughed it off."

Aware she had had too much to drink, Beck decided to leave the bar and walk to Weakley's loft a block and a half away. When she tried to stand up, she nearly fell over and she stumbled as she walked. Appellant left the bar at the same time as Beck and "insisted on driving" her to Weakley's loft. Beck "kept telling him, no" and that she "was going to walk" because the loft "was right down the street." Beck testified that "she was stumbling a lot," and as she and Appellant walked down the street, Appellant told her again he wanted to have sex with her. She told him that it "was never ever, ever going to happen" and she "had no interest in him whatsoever."

Beck then blacked out. She testified the next thing she remembered was "waking up in Appellant's truck." Beck testified she did not remember where she was when she blacked out or how she got into Appellant's truck. When she awoke, Beck was in the passenger seat of Appellant's truck. Beck's pants "were pushed

4

down to mid-thigh," Appellant was on top of her, facing her, and "his penis was inside [her] vagina." When Beck realized what was happening, she pushed Appellant off with both of her hands, and told him to get off of her. Beck testified Appellant then moved to the driver's seat of the truck, "grabbed [her] head and pulled [her] over to his side to do oral sex on him." Beck testified that when Appellant grabbed her head and pulled it down, her mouth contacted his penis. Beck "pulled back as soon" as she could, pulled her pants up, and "jumped out of the truck." She began walking "down the street and tried to go back" to Weakley's loft.

Beck testified the next thing she remembered was sitting on Weakley's bed in his loft. She could not recall how she got to Weakley's loft. She "just remember[ed] getting in his apartment and sitting down on his bed." Beck testified she did not tell Weakley what had happened because she was "still very messed up and trying to figure out what had happened" herself. She testified she was still "very intoxicated" and "could barely walk." She could not "see straight" and could not process fully "what had happened." Her memory of what happened next was "spotty."

Beck testified Weakley drove her to her "apartment on the west end." He dropped her "off at the front of the complex and drove away." As Weakley left, Beck realized she did not have her purse or her keys. She assumed they had fallen in Weakley's car. She called Weakley to ask him to return to her apartment. Beck stated that when "[Weakley] arrived, he pointed out that my keys were sticking out

5

of my pocket." Beck testified she began crying hysterically "[b]ecause at that point, [she] knew that she was not in control of what was happening." The next thing Beck remembered was being in her apartment with her dog. She took a shower and "sat there with [her] dog" and "just went to sleep."

Beck testified Weakley picked her up the next day to take her to work because she had left her car on The Strand the previous day. She testified she "didn't fully tell [Weakley] what had happened. I did tell him about [Appellant] grabbing me while we were at the bar." Beck testified she did not tell Weakley the full extent of what had happened because she "was still trying to figure out what I wanted to do with it, trying to figure out what had actually happened." She testified Weakley was "a bit of a hothead" and she "didn't want him to run down The Strand and try to beat [Appellant] up."

That same day, while Beck was at work, Appellant stopped by to return the contents of Beck's purse to her—her wallet, taser, and birth control. Appellant did not return her purse and the money that had been in her wallet was gone. Beck avoided eye contact with Appellant, took her belongings, and walked away. She worked the rest of her shift and then she "went home trying to figure out what to do with everything."

Beck testified that when she returned home she "pieced together pretty much the whole night" and was trying to decide whether to press charges. She testified

she knew of others who had pressed similar charges and "had horrible experiences with it and cases like it being drug out for five years." She also testified that "if there's any alcohol involved, police don't usually believe women." Beck worried that if she reported the incident "it would cause more harm in my life than good" because she would have to tell multiple people what happened, undergo a sexual assault nurse examination ("SANE"), and relive the incident for years. Beck ultimately decided to report what had happened to her because she wanted Appellant arrested and charged.

The next day, Weakley called Officer Jeff Banks ("Officer Banks") with the Galveston Police Department. Beck met with Officer Banks outside the cigar shop where Weakley worked. Beck testified she told Officer Banks that she went to a bar with Appellant and later blacked out, and that she woke up in Appellant's truck with him "on top of [her] and pushing him off." She could not recall whether she told Officer Banks about the "oral part," stating it was "a horribly disgusting thought, and I was just trying to tell him what had happened so we could get started," but she stated she disclosed the information during the SANE at the hospital.

When Officer Banks met with Beck outside the cigar shop, Beck was upset and hesitant to talk with him. Officer Banks testified Beck told him that "she had been raped the previous night." Officer Banks took Beck's statement and after, Beck followed him to the hospital for the SANE. Officer Banks testified Beck appeared

more comfortable at the hospital and provided Officer Banks with a description of Appellant, his name, and his place of work. Beck also told Officer Banks she thought she may have been drugged and that Appellant took some of her property. After he left Beck at the hospital, Officer Banks returned to the cigar shop to obtain a statement from Weakley. Officer Banks later referred the case to the Criminal Investigation Division.

On January 26, 2015, Detective Holly Johnson ("Detective Johnson") of the Galveston Police Department interviewed Beck about the incident. An audio and video recording of the interview was admitted at trial as State's Exhibit 8. In the interview, Beck stated she ran into Appellant after she left work and Appellant suggested they go and get a drink. Beck knew Appellant wanted to have sex with her. She stated she did not find Appellant attractive and would never want to have sex with him. Beck knew Appellant was thirteen years older than her because he often said how old he was. Beck told Appellant that, when he was thirteen years old, she had not even been born yet. Appellant had a two-year-old son and Beck thought it was "pretty gross" he wanted to have sex with her when he was the father of a young child.

While they were at the bar, Appellant told Beck she had to give him a chance. Beck repeated to Appellant she did not find him attractive, and she was never going to have sex with him, to which Appellant replied, "okay." Beck drank two glasses

8

of whiskey, and she and Appellant drank some shots. Beck stated she was usually pretty good about watching what she drank but she knew she had drunk a lot. Beck stated she was drunk. She went to the bathroom one time and, when she came back, there was another drink on the bar. Beck stated she planned to go to Weakley's loft because he lived down the street and she told Appellant she needed to go meet him. Appellant told Beck he would drive her to Weakley's loft. Beck told Appellant she would walk because she did not want to be with Appellant. Appellant then said he would walk her to Weakley's loft. Beck did not remember leaving the bar. Beck stated Appellant almost carried her out of the bar and she could not walk straight.

Beck stated she did not remember getting into Appellant's truck and that when she awoke she and Appellant were in Appellant's truck. Appellant was on top of her in the passenger seat of his truck. She did not remember Appellant pulling her pants down. Beck stated Appellant was having sex with her, but she did not know how that happened. Beck stated that as soon as she realized what was going on, she said, "no, get off me." She stated Appellant moved to the driver's seat of the truck and tried to grab her head, but she said, "no, stop." Beck jumped out of the truck and ran down the street to Weakley's loft. She stated she texted Weakley when she was leaving the bar, but it was two hours later when she finally made it to Weakley's loft.

Beck stated Weakley went to look for her and the bartender told Weakley Beck had left the bar. Weakley returned to Beck's apartment the next day to take her to work because she had left her car in downtown Galveston. Beck stated she always clipped her keys to her purse but that night her keys were in her back pocket and her purse was gone. Beck thought her purse was stolen. She stated Appellant showed up at her place of work the next day and brought her wallet and her birth control pills, but he did not return her cash or her taser. She stated the money in her wallet was gone. When Detective Johnson asked Beck if she thought Appellant stole her money, she replied, "yeah, I do."

Weakley testified he met Beck after she started working at the shop next to his loft. They became friends and later began dating. Weakley testified they sometimes had drinks together but Beck did not drink a lot because "she was very sensitive to alcohol." On the night of the incident, Weakley and Beck planned to meet at his loft after his shift at work. Beck told him she planned to go to Bobby's House of Spirits with some co-workers after work and she would meet him at his loft afterward. After Weakley arrived at his loft, he texted Beck and dozed off for a bit. When he awoke and Beck was not there, Weakley testified he was "a little irritated, concerned." He called and texted Beck who responded that she was on her way. Weakley testified there was a large gap between Beck's initial text and the next one, and that the texts were "jumbled, misspelled . . . lacking punctuation"

10

which was not typical of Beck's texts. When Beck did not show up, Weakley walked down to Bobby's House of Spirits. When he saw Beck was not there, he asked the bartender whether he had seen Beck with her co-workers at the bar. The bartender shrugged him off and did not respond to Weakley's question. Weakley left and began walking back toward his loft when he saw Beck standing in the street in front of his loft. He testified that "her hair was messed up, and her clothes were jumbled, and I believe her fly was unzipped," and she appeared dazed and confused. When Weakley asked Beck what happened, she told him she remembered being in a truck and getting out of a truck but did not remember any other details.

Weakley testified that he helped Beck walk up the stairs to his loft because she had trouble standing and walking. He testified Beck had to use the handrails and took a break halfway up where she nodded off several times before continuing to the loft. When they entered Weakley's loft, Beck laid down on his bed. Weakley testified he had never seen Beck in the condition she was in that evening. He testified he felt frustrated, irritated, concerned, and helpless because he did not know what had happened.

Weakley testified he later drove Beck to her apartment. Weakley was upset with Beck and left her in the parking lot in front of her apartment complex rather than walking her up to her second-floor apartment. When he returned to his loft, he saw a text from Beck stating she did not have her keys. He drove back to her

apartment and, as his headlights shined on Beck, he saw her keys in her back pocket. When he told her, "she looked down and just burst into tears." Weakley helped Beck into her apartment, put her into bed, and walked her dog. He returned the next morning to take Beck to work because her car was downtown where she had left it the previous night. On the ride to work, Beck told Weakley she remembered ordering shots, going to the restroom, and coming back and taking another shot, and then being in a truck and pushing someone off of her. Concerned, Weakley contacted Officer Jeff Banks with the Galveston Police Department whom he knew because Officer Banks was a member of the cigar shop where Weakley worked. Officer Banks later met with Beck outside the cigar shop before accompanying her to the hospital. Weakley testified he and Beck continued to date for several months but later broke up.

Nellie Loewen ("Loewen"), the Forensic Nursing Team program Coordinator at University of Texas Medical Branch ("UTMB") in Galveston, conducted Beck's SANE. During the examination, Beck gave Loewen the following statement about the incident:

> Went to the bar with him, [Appellant]. We had a few drinks. He is very open about sex and how much he wanted to have sex with me. I repeatedly told him, 'no.' I would not have sex with—in my life. We kept drinking, had a few drinks and a couple of shots, and then, I left. I tried to leave to go to my friend's place, Weakley. He said he would drive me there. I was falling down walking out the bar. That's the only reason I went to his truck with him. I kinda blacked out. I don't

12

remember getting into—into—getting in his truck at all. . . . And I kinda woke up with him on top of me, having sex with me, having his penis in my vagina. My pants were like halfway down. I didn't stop it at first because I didn't exactly know what was happening, but then I pushed him off of me. . . . I pushed him with my hands to his side of the truck. I pulled my pants up and I said, "I had to go" and I stumbled down the street. That's it. I don't remember everything.

Loewen testified that her examination of Beck revealed some redness, and Beck cried at times during the examination.

In 2016, Officer Banks took over the sex crimes investigations for the Galveston Police Department and discovered that Beck's case was listed as inactive. After he received the lab results from the case, Officer Banks determined he had sufficient information to attempt to identify a suspect. With the information Beck had provided him about the perpetrator—first name, a general description, and employers—he contacted Gizmo's Bar and confirmed that a person with the same name and description Beck had provided worked there. Officer Banks called Beck and asked her to come to the police department to view a photo lineup. Beck identified Appellant from among the photos as the man who sexually assaulted her and, under witness comment statement, she wrote, "100 percent sure."

Officer Banks contacted Appellant to obtain a statement. Appellant spoke with Officer Banks about Beck's allegations but refused to meet with him. Appellant was later arrested and charged with the felony offense of sexual assault. In an

13

enhancement paragraph, the State also alleged Appellant had been previously convicted of the felony offense of injury to a child.

At the close of evidence, the jury found Appellant guilty of the charged offense. Appellant elected to have the trial court assess punishment. Appellant pleaded true to the allegations in the enhancement paragraph, and the trial court assessed Appellant's punishment at fifteen years' confinement. The trial court imposed Appellant's sentence on February 10, 2020.

On March 10, 2020, Appellant filed a motion for new trial. Citing to the Texas Supreme Court's and Texas Court of Criminal Appeals' First Emergency Order Regarding the COVID-19 State of Disaster ("First Emergency Order"), Appellant filed a motion to extend the motion hearing deadline and the trial court's plenary power until May, 8, 2020. On March 25, 2020, the trial court entered a "Court Order Extending [Motion for New Trial] Hearing Deadline and Plenary Power of Trial Court." The trial court held a hearing on Appellant's motion for new trial on May 8, 2020, and entered an order denying the motion the same day.

**Sufficiency of the Evidence**

In his first point of error, Appellant contends the evidence is insufficient to support his conviction for sexual assault because the State failed to prove scienter. He argues that, based on the evidence presented at trial, the jury could not have rationally concluded beyond a reasonable doubt that Appellant knew Beck had

14

withdrawn "her consent in Appellant's truck and left." He claims the evidence "clearly indicates Beck had casual sex with [him] and made up a story the next day to placate her boyfriend."

## A.     Standard of Review

We review a challenge to the sufficiency of the evidence under the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). We examine all of the evidence in the light most favorable to the jury's verdict to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Our role is that of a due process safeguard, and we consider only whether the factfinder reached a rational decision. *See Malbrough v. State*, 612 S.W.3d 537, 559 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd); *see also Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016) (observing that reviewing court's role on appeal "is restricted to guarding against the rare occurrence when a fact finder does not act rationally") (quoting *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010)).

In a sufficiency review, we must consider the "combined and cumulative force" of the circumstances pointing toward guilt. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). "Circumstantial evidence is as probative as direct

evidence in establishing the guilt of an actor" and "the standard of review on appeal is the same for both direct and circumstantial evidence cases." *Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010) (quoting *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)). The trier of fact is the sole judge of the weight and credibility of the evidence. *See Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018); *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Limonta-Diaz v. State*, 593 S.W.3d 447, 456 (Tex. App.—Austin 2020, pet. ref'd); *see Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we must defer to the weight determinations of the factfinder. *Cary v. State*, 507 S.W.3d 750, 757 (Tex. Crim. App. 2016); *Nowlin v. State*, 473 S.W.3d 312, 317 (Tex. Crim. App. 2015). A reviewing court, faced with a record of historical facts supporting conflicting inferences, must presume the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution. *Jackson*, 443 U.S. at 326. When there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. *Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006).

**B.    Applicable Law**

A person commits the offense of sexual assault "if . . . the person intentionally or knowingly . . . causes the penetration of the . . . sexual organ of another person by any means, without that person's consent . . . ." TEX. PENAL CODE § 22.011(a)(1)(A). The Penal Code sets forth several circumstances in which a sexual act is considered to be without a person's consent. *See id.* § 22.011(b)(1)–(14). Relevant here, "[a] sexual assault under Subsection (a)(1) is without the consent of the other person if: . . . (3) the other person has not consented and the actor knows the other person is unconscious or physically unable to resist; . . . [or] (5) the other person has not consented and the actor knows the other person is unaware that the sexual assault is occurring . . . ." *Id.* § 22.011(b)(3), (5). The jury was charged on both of these statutory provisions.

**C.    Analysis**

Appellant admits he engaged in sexual intercourse with Beck but disputes he did so without her consent. He argues the evidence presented at trial did not establish he knew Beck was unconscious or otherwise unable to consent, or that Beck had not consented to sex up to the point she pushed Appellant off of her. The State responds that, based on the evidence presented at trial, the jury was entitled to find that Beck did not consent to sexual intercourse with Appellant, and Appellant knew Beck was

unconscious, not physically able to resist, and unaware the sexual assault was occurring.

Appellant first contends there is legally insufficient evidence that Beck did not consent to sex. He asserts the evidence presented at trial shows Beck had casual sexual intercourse with Appellant, fabricated a story the next day to placate Weakley, and got stuck in the false narrative after Weakley called Officer Banks. The evidence showed that prior to December 21, 2014, Beck repeatedly and consistently told Appellant she did not want to have sex with him in response to his repeated advances. Appellant told Beck on numerous occasions he wanted to have sex with her, and each time Beck responded she was not attracted to him and told him she "wanted nothing to do with that." Beck considered the age difference between her and Appellant to be "a very large gap" and she had no interest in anybody who was that much older than her and had a child. Beck testified that when Appellant asked her "to give him a chance" while they were at the bar the night of the incident, she responded that she "was not interested whatsoever." She testified Appellant later tried to put his hand near her vagina, and she pushed him away and told him not to do that. When Appellant told her he would drive her to Weakley's loft, Beck told him she would walk because the loft was right down the street. As she and Appellant walked down the street, Appellant told Beck again that he wanted to have sex with her and she responded that it "was never ever, ever going to happen"

18

and she "had no interest in him whatsoever." The jury also heard testimony that Beck and Weakley were in an exclusive, intimate relationship, and Appellant knew of their relationship. Beck testified that when they left the bar, she told Appellant she was going to Weakley's loft, that Appellant insisted on driving her there in his truck, and she declined his invitation telling him she would walk to the loft instead. Based on this evidence, reflecting the multiple times Beck rejected Appellant's sexual advances both prior to and on the night of the incident, the jury was entitled to find Beck did not consent to sexual intercourse with Appellant.

Appellant also contends the evidence is insufficient to show he knew Beck was unconscious or otherwise unable to consent to sexual intercourse. He argues the evidence showed only that Beck became intoxicated and blacked out intermittently after they left the bar and up until the point when she pushed him off of her in his truck. Appellant argues that memory lapses do not equate to lack of consent.

In *Wilson v. State*, 473 S.W.3d 889 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd), this Court explained that a complainant's inability to recall a sexual assault is not dispositive of the issue of consent. We held that evidence a complainant is unconscious because of voluntary intoxication is sufficient to prove lack of consent. *See id.* at 897. In that case, the complainant attended a party at which she had a lot to drink. *See id.* at 892. She testified she continued drinking

19

throughout the night and, at a certain point, began feeling unusual, drunk, and intoxicated. *See id.* When she later awoke in a game room, she was no longer wearing her pants and underwear, still felt drunk, and had trouble moving around on her own. *See id.* The complainant testified she did not remember taking her clothes off, did not consent to having sexual intercourse, and did not want to have sexual intercourse with the defendant. *See id.* This Court concluded that, from the evidence presented at trial, "one reasonably could infer that appellant knew the complainant was unconscious, physically unable to resist, or was unaware that he was engaging in sexual intercourse with her, and thus, also knew that she did not consent." *Id*. at 899.

Other courts have found that evidence a complainant was unconscious due to voluntary intoxication is sufficient to prove lack of consent. *See, e.g.*, *Ray v. State*, No. 03-13-00085-CR, 2014 WL 4362969, at *2–4 (Tex. App.—Austin Aug. 26, 2014, no pet.) (mem. op., not designated for publication) (holding evidence legally sufficient to support sexual assault conviction where complainant was "very intoxicated," "passed out," and awoke "naked from the waist down"); *In re E.I.G.*, 346 S.W.3d 644, 645–47 (Tex. App.—El Paso 2009, no pet.) (holding evidence sufficient to support sexual assault conviction where complainant, who "was only wearing her blouse" when she awoke, did not remember "if the male in the room with her did anything," but "[a]ppellant was seen on top of an unconscious

20

[complainant], and jumped off her when someone entered . . . the room"); *see also Elliott v. State*, 858 S.W.2d 478, 485 (Tex. Crim. App. 1993) (finding evidence that complainant was unconscious due to voluntary intoxication sufficient to prove lack of consent); *Everson v. State*, No. 01-07-00510-CR, 2008 WL 2548843, at *3–6 (Tex. App.—Houston [1st Dist.] June 26, 2008, pet. ref'd) (mem. op., not designated for publication) (upholding sexual assault conviction where complainant "became voluntarily intoxicated by taking pills and passed out[] [and] remained unconscious throughout the sexual intercourse").

*Limonta-Diaz v. State*, 593 S.W.3d 447 (Tex. App.—Austin 2020, pet. ref'd) is also instructive. In that case, the complainant went out to dinner, listened to a band, and socialized with friends. *See id*. at 450. After having several drinks over the course of the evening, the complainant felt intoxicated and drunk. *See id.* The complainant requested a ride home through the RideAustin app. *See id.* She did not recall where she met the rideshare driver or how she got into his car. *See id.* The last thing she remembered was talking to the bartender at the last bar she visited that night. *See id.* The complainant's next memory was trying to direct the rideshare driver to the road for her apartment's front door. *See id.* She then remembered the driver being in the backseat on top of her. *See id.* She recalled trying to push the driver off of her with her arms and then tumbling out of the car. *See id.* Her brother, with whom she shared an apartment, testified that the complainant was on the "more

21

severe side of drunk," seemed unaware her clothing was in disarray, and was unsteady to the point he had to help her to the couch. *See id.* The court held that, given the evidence of the complainant's intoxication, the jury could reasonably conclude her memory gaps represented times during which she was unaware of the sexual assault due to her level of intoxication. *See id.* at 459. The court emphasized that nothing in the statute requires "total" or extended unconsciousness. *Id.*

In this case, the jury heard testimony that Beck drank two glasses of whiskey and three shots while at the bar with Appellant. When she tried to get up and leave the bar, she nearly fell over and stumbled as she walked. Beck testified she was "stumbling a lot" and Appellant insisted on driving her to Weakley's loft, but she told him she would walk instead. She testified the next thing she remembered was waking up in Appellant's truck. She did not remember where she was when she blacked out or how she got into Appellant's truck. When she regained consciousness, she was in the passenger seat of Appellant's truck with her pants pushed down to mid-thigh, and Appellant was on top of her, facing her, with his penis inside her vagina. As soon as Beck realized what was happening, she pushed Appellant off and told him to get off of her.

Weakley testified that Beck did not drink much because she was very sensitive to alcohol. He testified that Beck's texts to him that night were jumbled and incoherent. When Weakley found Beck on the street outside of his loft, she looked

22

dazed and confused and her speech was nonsensical. Weakley had to help Beck up the stairs because she had trouble standing and walking. Beck took a break halfway up the stairs where she nodded off several times before continuing to the loft. Weakley testified he had never seen Beck in the condition she was in that night.

Beck did not remember contacting Weakley that night, and she did not remember sending him the jumbled text messages. Beck had little memory of walking to Weakley's loft, and she did not remember arriving at the loft. She did not remember how she ascended the stairs in Weakley's building or gained access to his loft. Beck testified she did not remember seeing Weakley on the street or on the stairs leading to his loft, and she only remembered waking up on Weakley's bed. Beck testified that, at that point, she was still very intoxicated, could not see straight, could barely walk, and could not process what had happened. Based on this evidence the jury could reasonably infer that when Appellant was having intercourse with Beck, Beck was unconscious or otherwise unable to consent to sexual intercourse.

Appellant argues Beck changed the details of her account depending on the person to whom she was talking. He points to Weakley's testimony that Beck told him she was going out with co-workers after work when in fact she was going out with Appellant, and Beck's testimony at trial that she did not remember going to Appellant's truck yet she told Loewen, the SANE nurse, that she went to Appellant's truck because she "was falling down walking out the bar." To the extent there is any

23

discrepancy between Beck's testimony and the testimony of other witnesses, or in her own testimony, the jury was the sole judge of the credibility of the witnesses at trial, and we defer to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from the facts. *See Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) (observing that jury "may accept one version of the facts and reject another, and it may reject any part of a witness's testimony"); *see also Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018) ("A reviewing court is thus 'required to defer to the jury's credibility and weight determinations.'").

From the evidence presented at trial, the jury was entitled to find that Appellant knew, during the assault, that Beck was not conscious, that she was physically unable to resist, or that she was unaware Appellant was engaging in sexual intercourse with her. *See Wilson*, 473 S.W.3d at 899; *Hughes v. State*, 194 S.W.3d 649, 654 (Tex. App.—Tyler 2006, pet. ref'd) (concluding jury could infer defendant knew he did not have complainant's consent because he began sexually assaulting her while she slept); *see also Jackson*, 443 U.S. at 319 (noting jury's task is to draw "reasonable inferences" from evidence).

Viewing the evidence in the light most favorable to the jury's verdict and based on the combined and cumulative force of the circumstantial evidence along with the reasonable inferences drawn from it, we conclude a rational trier of fact

24

could have found beyond a reasonable doubt that Appellant's sexual intercourse with Beck was without her consent. We hold that the evidence is sufficient to support Appellant's conviction for sexual assault. We overrule Appellant's first point of error.

**Motion for New Trial**

Appellant's second through fifth points of error relate to the trial court's denial of his motion for new trial. As a threshold matter, we must consider whether the trial court had plenary power to hear and rule on Appellant's motion for new trial on May 8, 2020.

**A.** **Jurisdiction**

A trial court generally retains plenary power over a criminal prosecution for thirty days after imposing or suspending a sentence in open court. *See* TEX. R. APP. P. 21.3, 21.4(a); *State v. Davis*, 349 S.W.3d 535, 537 (Tex. Crim. App. 2011). During these thirty days, a criminal defendant may file a motion for new trial. TEX. R. APP. P. 21.3, 21.4(a); *Davis*, 349 S.W.3d at 537. The filing of a timely motion for new trial extends the trial court's plenary power up to seventy-five days after the trial court imposes a sentence. TEX. R. APP. P. 21.8(a); *Ex Parte Matthews*, 452 S.W.3d 8, 13 (Tex. App.—San Antonio 2014, no pet.). The trial court must rule on the motion for new trial within seventy-five days of the sentence date or the motion will be deemed denied by operation of law upon expiration of the seventy-five-day

period. TEX. R. APP. P. 21.8(a), (c); *Montelongo v. State*, 623 S.W.3d 819, 823 (Tex. Crim. App. 2021) ("Obviously, a motion for new trial is overruled when the trial court enters an order overruling the motion" but "a motion for new trial can also be overruled by operation of law without any action on the trial court's part"). "[O]nce a motion for new trial is overruled by operation of law, the trial court loses jurisdiction to rule upon it." *Montelongo*, 623 S.W.3d at 823 (quoting *State v. Moore*, 225 S.W.3d 556, 566–67 (Tex. Crim. App. 2007)). An order entered by a trial court without jurisdiction to do so is void. *Ex parte Alexander*, 685 S.W.2d 57, 60 (Tex. Crim. App. 1985) (concluding only Court of Criminal Appeals had authority to grant relief requested by defendant in habeas proceeding and trial court's order granting such relief was void and should be set aside).

The trial court imposed Appellant's sentence on February 10, 2020. Pursuant to Rule of Appellate Procedure 21.4(a), Appellant had to file his motion for new trial within thirty days after the trial court imposed his sentence, or by March 11, 2020. *See* Tex. R. App. P. 21.4(a). Appellant timely filed a motion for new trial on March 10, 2020, thereby extending the trial court's plenary power until April 25, 2020— seventy-five days after the date the trial court imposed the sentence. *See* TEX. R. APP. P. 21.8(a).

On March 20, 2020, Appellant filed a motion to extend the new trial hearing deadline and the trial court's plenary power. On March 25, 2020, the trial court

26

entered a "Court Order Extending [Motion for New Trial] Hearing Deadline and Plenary Power of Trial Court" until May 8, 2020. In its ruling, the trial court relied on the Texas Supreme Court's and Texas Court of Criminal Appeals' First Emergency Order Regarding the COVID-19 State of Disaster ("First Emergency Order"), issued on March 13, 2020, to extend the time to rule on Appellant's motion for new trial beyond the seventy-five-day deadline.[1] The trial court held a hearing on Appellant's motion for new trial on May 8, 2020, and entered an order denying the motion the same day.

In *In re State ex rel. Ogg*, 618 S.W.3d 361 (Tex. Crim. App. 2021) (orig. proceeding), the Court of Criminal Appeals recently addressed whether the identical provision in the Texas Supreme Court's subsequent Emergency Orders Regarding the COVID-19 State of Disaster authorizes trial courts to extend jurisdictional deadlines. The Court held neither the provision in the emergency orders nor Government Code section 22.0035(b)—which authorizes the Texas Supreme Court

---

[1] The March 13, 2020 Order states: "Subject only to constitutional limitations, all courts in Texas may in any case, civil or criminal—and must to avoid risk to court staff, parties, attorneys, jurors, and the public—without a participant's consent . . . [m]odify or suspend any and all deadlines and procedures, whether prescribed by statute, rule, or order, for a stated period ending no later than 30 days after the Governor's state of disaster has been lifted . . . ." Supreme Court of Texas, First Emergency Order Regarding the COVID-19 State of Disaster, Misc. Docket Nos. 20-9042, 596 S.W.3d 265, 265 (Tex. 2020).

to "modify or suspend procedures for the conduct of any court proceeding affected by a disaster during the pendency of a disaster declared by the governor"— authorizes trial courts to modify substantive rights because the provision refers only to procedural matters. *Id.* at 364. The Court explained:

> This language giving a court the power to modify or suspend "deadlines and procedures" presupposes a pre-existing power or authority over the case or the proceedings. A court may extend a deadline or alter a procedure that would otherwise be part of the court proceedings. It does not suggest that a court can create jurisdiction for itself where the jurisdiction would otherwise be absent or that a judge could create authority to preside over proceedings over which the judge would otherwise be barred from presiding. . . .
>
> If the Supreme Court's Emergency Order were really intended to permit trial courts to enlarge their own jurisdiction and to permit trial judges to enlarge the types of proceedings over which they have authority, we would expect a provision to explicitly say so.

*Id.* at 364–65.

The deadline to rule on a motion for new trial is not procedural in nature—it is jurisdictional and, after it expires, the trial court loses authority to act in the case. *See Montelongo*, 623 S.W.3d at 823. By entering its March 25, 2020 order extending the motion hearing deadline and subsequently ruling on Appellant's motion for new trial on May 8, 2020, the trial court impermissibly sought to "create jurisdiction for itself where the jurisdiction would otherwise be absent." *Ogg*, 618 S.W.3d at 364. The trial court's plenary power expired on April 25, 2020. The trial court thus lacked

subject matter jurisdiction to enter its May 8, 2020 order denying Appellant's motion for new trial. *See id.*

Because the trial court did not rule on Appellant's motion for new trial within the prescribed seventy-five day period, the motion was overruled by operation of law on April 25, 2020. *See* TEX. R. APP. P. 21.8(a), (c). A hearing conducted after a motion for new trial has been overruled by operation of law is not authorized. *See State v. Moore*, 225 S.W.3d 556, 570 (Tex. Crim. App. 2007); *Jackson v. State*, 550 S.W.3d 238, 245 (Tex. App.—Houston [14th Dist.] 2018, no pet.). Consequently, we cannot consider the record from the new trial hearing held on May 8, 2020. We limit review of Appellant's points of error two through five to the record before us through April 25, 2020, the date on which the trial court's jurisdiction expired.

**B.     Standard of Review**

We review the denial of a motion for new trial for an abuse of discretion. *State v. Gutierrez*, 541 S.W.3d 91, 97–98 (Tex. Crim. App. 2017) (citing *State v. Herndon*, 215 S.W.3d 901, 906–07 (Tex. Crim. App. 2007)). The court abuses its discretion only if its ruling is not supported by any reasonable view of the record. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). This deferential review requires us to view the evidence in the light most favorable to the trial court's ruling. *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004). We may not substitute our own judgment for that of the trial court and must uphold the trial

29

court's ruling if it is within the zone of reasonable disagreement. *Webb*, 232 S.W.3d at 112.

## C.    Trial Judge's Comments During Voir Dire

In his second point of error, Appellant contends the trial court abused its discretion in denying his motion for new trial because the trial judge's comments during voir dire violated his Fifth Amendment right not to testify at trial and to the presumption of innocence.[2]  Appellant complains of comments made by the trial judge to the venire panel while explaining a defendant's Fifth Amendment right not to testify.  The trial judge stated:

> Real important part of this whole process.  As we sit here today, the Defendant is presumed to be innocent.  You have not heard a single bit of evidence.  You know nothing about the facts of this case.  They haven't proven a single thing.  The Defendant is presumed to be innocent.  And the presumption of innocence alone is sufficient to find the Defendant not guilty.  Again, the presumption of innocence alone is sufficient to find the Defendant not guilty.  Until the State has met its burden of proving each and every element of the offense beyond a reasonable doubt, he is presumed innocent.  Can everyone follow that? Anyone have a problem?  The mere fact that we're here is no evidence whatsoever of guilt.  The State has that burden to prove him innocent [sic].  We've already got a jury over here.  So, if I ask you folks what your verdict is, what must your verdict be, No. 57?
>
> Prospective Juror No. 5: Not guilty.

---

[2]    The Fifth Amendment to the United States Constitution provides, in pertinent part: "No person shall be . . . compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law . . . ."  U.S. CONST. amend. V.

The Court: Why?

Prospective Juror No. 5: Because they have not proven anything yet.

The Court: The presumption of innocence alone is sufficient to find the Defendant not guilty. Everyone understand that? Very important. The State of Texas has to meet its burden. Has to prove its case. Anyone have a problem with that? All right. The Defendant also has a right to testify, get up and tell his story. He has a right to not testify. **You can't be the one who is used to prove yourself guilty**. The State has to prove it by competent evidence. You have the Fifth Amendment right not to testify. If you don't get up and testify—there's a lot of reasons why people wouldn't. The Defendant and his attorneys will make that decision at the appropriate time. But I will instruct you now, I'll tell you at the end of the trial when you go to deliberate that you cannot and must not consider, refer to, allude to that fact if he does not testify. Is there anyone here that says, "Oh, no, if he doesn't testify, Judge, he starts off behind the eight-ball with me?" Like I say, there's a lot of reasons why you wouldn't. **Can everyone follow that, Fifth Amendment right not to be the one to prove yourself guilty**? Anyone over here have a problem? How about over here? And in the jury box? All right.

(Emphasis added). Appellant contends the error was compounded even more when the trial judge admonished the jurors not to seek information about the case from news articles:

Please do not do any independent research on the law or the parties or me or anyone involved in this case, because you might get it wrong. I know it's Monday morning. Hold on tight. Everything on the Internet is not true. And I'm Exhibit A. I love to tell this story. They've all heard it before. A few years ago, we had a local elected official here in Galveston County, just kind of basically lose his mind, did a bunch of stupid stuff. A Grand Jury operating out of this Court indicted him on eight counts. A Grand Jury meets downstairs. I never have anything do with them other than swearing them in when they come in for the

start of their three-month period. They return indictments, which just says there's a—there's a chance that something has gone wrong. I signed those eight indictments. That's all I did. A couple days later, I have Google alert on my cell phone, and it starts going off, telling me my name is being mentioned on the Internet. That's why I have it on there, to find out. And so, I go to check, and there's a little advocacy group out of Illinois that had something kind of tangential to do with what this guy had done. That was their big cause. And on their blog the headline is, "Texas Judge Kerry Neves Indicted on Eight Counts." . . . But the point is, they got it wrong. I just signed it [the 8-count indictment]. I wasn't the bad guy. They corrected it. They withdrew it. They apologized, et cetera. But the point of it is, on the Internet, as we tell our kids, "Once it's there, it's there." If you were to go out and Google me, that original story is still there and it might pop up. And you're back there with your fellow jurors and you say: We can't believe a word this Neves guy says, because he's been indicted on eight counts. See, you would be wrong. And the same thing could happen if you go and investigate the facts of this case or anything of that nature or try to figure out the law. I will give you all you need to know when you go to deliberate in the way of instructions and definitions and things like that. So, can I get a commitment that you won't go and do any independent research. At least don't Google me because I don't want that story to pop up again. All right. Everybody good with that?

"Ordinarily, a complaint regarding an improper judicial comment must be preserved at trial." *Unkart v. State*, 400 S.W.3d 94, 99 (Tex. Crim. App. 2013); TEX. R. APP. P. 33.1(a). Appellant acknowledges he did not object to the trial judge's comments. Relying on *Proenza v. State*, 541 S.W.3d 786 (Tex. Crim. App. 2017), however, he argues an objection was not necessary to raise his complaints on appeal because the comments violated Article 38.05 of the Texas Code of Criminal Procedure. In *Proenza*, the Court of Criminal Appeals considered whether a complaint alleging a violation of Article 38.05 must be preserved in the trial court

32

to be considered on the merits on appeal. *Id.* at 791–801. The Court held that such a statutory complaint, being at least a category-two, waiver-only *Marin* right,[3] was not forfeited by a failure to object and may be raised for the first time on appeal. *Id.* at 801. We thus consider Appellant's argument that the trial judge's comments violated Article 38.05.

Article 38.05 of the Texas Code of Criminal Procedure prohibits a trial judge from commenting on the weight of the evidence in criminal proceedings or otherwise divulging to the jury his opinion of the case. It provides that

> In ruling upon the admissibility of evidence, the judge shall not discuss or comment upon the weight of the same or its bearing in the case, but shall simply decide whether or not it is admissible; nor shall he, at any stage of the proceeding previous to the return of the verdict, make any remark calculated to convey to the jury his opinion of the case.

TEX. CODE CRIM. PROC. art. 38.05. In evaluating a claimed violation of Article 38.05, we first determine whether the trial court's comments were, in fact, improper. *Simon v. State*, 203 S.W.3d 581, 590 (Tex. App.—Houston [14th Dist.] 2006, no pet.). If so, we must then decide whether the comments were material. *Id.* at 592. If the comments were both improper and material, we address harm, using the

---

[3] In *Marin v. State*, 851 S.W.2d 275, 279 (Tex. Crim. App. 1993), the Court of Criminal Appeals described Texas criminal adjudicatory system as containing error-preservation "rules of three distinct kinds: (1) absolute requirements and prohibitions; (2) rights of litigants which must be implemented by the system unless expressly waived; and (3) rights of litigants which are to be implemented upon request."

standard for non-constitutional harm set forth in Rule of Appellate Procedure 44.2(b). TEX. R. APP. P. 44.2(b); *Proenza*, 541 S.W.3d at 801.

Appellant contends the trial judge's comments during voir dire that "[y]ou can't be the one to prove yourself guilty" and his categorization of the Fifth Amendment right as the right "not to be the one to prove yourself guilty" violated Article 38.05. He argues the statements improperly conveyed to the jurors that a defendant's election not to testify implies he is guilty "because, if he did testify, he would be likely to incriminate himself." Appellant argues the trial judge's misstatements were so prejudicial that they constituted constitutional error, led Appellant to believe the trial court was not acting impartially, and impacted the jury's deliberations and decisions.

The trial judge's comments, while perhaps imprecise and inartful, did not constitute comments on the weight of the evidence or reflect any opinion the trial judge had of the State's case against Appellant. *See* TEX. CODE CRIM. PROC. art. 38.05 (prohibiting trial judge from commenting on weight of evidence in criminal proceedings or otherwise divulging to jury judge's opinion of case). To the contrary, when viewed in context, the trial judge's comments were part of an extended effort to emphasize to the jurors that they should not hold a defendant's failure to testify against him. *See Unkart*, 400 S.W.3d at 101 (concluding defendant was not entitled to mistrial on basis of trial judge's comments during voir dire stating he personally

34

would want to testify if accused of crime but others might have different perspective because they were part of broader effort to hammer home to jurors that they should not hold defendant's failure to testify against him).

The trial judge repeatedly emphasized to the jurors during voir dire that it was "real important" they recognized "the Defendant is presumed to be innocent," and "the presumption of innocence alone is sufficient to find the Defendant not guilty." The trial judge also told the jurors during voir dire that it was "very important" that they recognize "the State of Texas has to meet its burden." When discussing Appellant's Fifth Amendment right not to testify, the trial judge admonished the prospective jurors, "I will instruct you now, I'll tell you at the end of the trial when you go to deliberate that you cannot and must not consider, refer to, allude to that fact if he does not testify."

In his final charge to the jury, the trial judge also stated, "in the event [Appellant] elects not to testify, that fact cannot be taken as a circumstance against him," and, "[i]n this case, [Appellant] has elected not to testify and you are instructed that you cannot and must not refer to or allude to that fact throughout your deliberations or take it into consideration for any purpose whatsoever as a circumstance against him." The trial judge also instructed the jurors, "A Grand Jury indictment . . . is not evidence of guilt nor can it be considered by you in passing upon the question of guilt of [Appellant]." He further instructed the jurors, "The

fact that a person has been arrested, confined, indicted for, or otherwise charged with, the offense gives rise to no inference of guilt at his trial. The law does not require a Defendant to prove his innocence or produce any evidence at all. The presumption of innocence alone is sufficient to acquit the Defendant . . . ."

The trial judge made his comments with the "manifest intent to benefit the defendant and to protect his rights [and] were part of an extended effort to hammer home to the jurors that they should not hold a defendant's failure to testify against him." *Unkart*, 400 S.W.3d at 101; *see also Knott v. State*, 513 S.W.3d 779, 801–02 (Tex. App.—El Paso 2017, pet. ref'd) (concluding trial court's explanation to jury panel of defendant's constitutional right against self-incrimination, using example in which driver charged with speeding took stand and unwittingly provided incriminating testimony, did not constitute direct comment on defendant's constitutional right to remain silent; jury would not have perceived trial court's message as being that defendants do not testify because they are guilty, trial court informed jury that there were circumstances where it might not be good idea for innocent person to testify, and trial court emphasized importance of defendant's constitutional right to remain silent and presumption of innocence). We generally presume the jury followed the trial court's instructions. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005).

Considering the trial judge's statements in context, we conclude the comments did not bear on the presumption of innocence or show the trial judge was biased or lacked impartiality. *Loge v. State*, 550 S.W.3d 366, 381 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (concluding trial judge's statements to venire panel "we all know why we're here for, you know what you're here for, you know what you're required to do" and to "not worry" about sex offender defendant's potential fine because "it goes to State anyway and it just take more time for ya'll to make a decision" did not demonstrate lack of impartiality or constitute violation of defendant's presumption of innocence; judge subsequently told jurors they must find defendant not guilty unless jurors were convinced beyond reasonable doubt State had proved its case, judge admonished venire panel on statutory punishment range for offense and questioned panel whether any venire members were unable to consider full range of punishment, and nothing in statement to venire panel indicated that he expected guilty verdict).

Appellant also complains of the trial judge's comments while admonishing the jurors not to seek information about the case from news articles or conduct independent research. During the admonishment, the trial judge told the prospective jurors a story involving a previous, unrelated case in which the judge signed indictments and where a news article later erroneously reported the judge had been the one indicted. While making his comments, the trial judge told the prospective

37

jurors that he was not the "bad guy" and suggested that, if they read the article, they might conclude they could not believe anything he said because he had been indicted. Appellant argues these comments violated Article 38.05 because they directly implied to the jury that a defendant who has been indicted is a "bad guy," and the comment was reasonably calculated to convey to the jury that the trial judge was siding with the prosecution. This argument is unavailing.

Contrary to Appellant's assertion, the trial judge merely attempted to illustrate, by way of example, what might happen if jurors decide to do their own research of the law, the facts of the case, or the parties. The trial judge concluded his comments by emphasizing to the jurors that he would provide them with everything they needed in the jury charge, including instructions and definitions, prior to their deliberations. The trial judge's comments neither constituted comments on the weight of the evidence nor reflected any opinion the trial judge had of the State's case against Appellant. *See* TEX. CRIM. APP. PROC. art. 38.05; *Loge*, 550 S.W.3d at 379 (concluding trial judge's statement to jurors that some countries permit verdict of "not guilty," "guilty," or "not proved guilty," and that judge "kind of like[s]" the third option was no expression of the trial judge's opinion regarding defendant's innocence in case).[4]

---

[4]     We note any "residual harm" arising from the trial court's comments could have been cured by a timely instruction to disregard the example given by the trial court,

38

We overrule Appellant's second issue.

## D. Ineffective Assistance of Counsel

In his third and fourth points of error, Appellant contends the trial court abused its discretion in denying his motion for new trial because he received ineffective assistance of counsel at the guilt-innocence stage when trial counsel failed to (1) investigate available witnesses to assist in his defense and (2) seek a forensic examination of the video/audio recordings produced in discovery.

### 1. Applicable Law

We review an ineffective assistance of counsel claim under the two-pronged test enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance of counsel, the defendant must show (1) counsel's performance was deficient and (2) a reasonable probability exists that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 687, 694. The defendant bears the burden of proof on both issues, and failure to make either showing by a preponderance of the evidence will defeat his ineffectiveness claim. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). The right to effective assistance of counsel does not provide a right to

but Appellant failed to request any such instruction. *See Unkart*, 400 S.W.3d at 102; *Knott*, 513 S.W.3d at 802.

39

errorless counsel, but rather to objectively reasonable representation. *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011).

When evaluating a claim of ineffective assistance, the appellate court looks to the totality of the representation and the particular circumstances of each case. *See Thompson*, 9 S.W.3d at 813. There is a strong presumption that counsel's conduct fell within a wide range of reasonable representation. *See Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005). To overcome the presumption of reasonable professional assistance, "[a]ny allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Thompson*, 9 S.W.3d at 813. When determining the validity of an ineffective assistance claim, any judicial review must be highly deferential to trial counsel and avoid the distorting effects of hindsight. *Ingham v. State*, 679 S.W.2d 503, 509 (Tex. Crim. App. 1984) (citing *Strickland*, 466 U.S. at 669).

If a criminal defendant can prove that trial counsel's performance was deficient, he must still affirmatively prove he was prejudiced by counsel's actions. *Thompson*, 9 S.W.3d at 812. This requires the defendant to demonstrate a reasonable probability that the result of the proceeding would have been different if trial counsel had acted professionally. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Mallett v. State*, 65 S.W.3d 59, 63 (Tex.

40

Crim. App. 2001). When a defendant asserts ineffective assistance in a motion for new trial, we review the trial court's denial of the motion for abuse of discretion. *Parker v. State*, 462 S.W.3d 559, 562 (Tex. App.—Houston [14th Dist.] 2015, no pet.). We view the evidence in the light most favorable to the ruling and reverse only if no reasonable view of the record could support the ruling. *Id*. We review de novo the trial court's decision on the prejudice prong while giving deference to the trial court's implied resolution of the underlying factual determinations supporting denial of the motion when based solely on affidavits. *See Charles*, 146 S.W.3d at 208.

### 2. Failure to Investigate

In his motion for new trial, as he does on appeal, Appellant contends his attorney acknowledged that he failed to interview or call any witnesses during the guilt-innocence phase of trial or investigate whether any video surveillance cameras recorded the interaction between Appellant and Beck. In support of his contention, Appellant points to his trial attorney's affidavit stating, in relevant part:

. . . .

3. During the investigation of this event and in preparation for trial, I did not:

(a) Seek to investigate whether or not there were video surveillance cameras on the buildings and/or businesses in the area of the events which may have captured any interaction between [Appellant] and the complainant;

41

(b) Seek to find the identity of persons who were present at the bar [at] which [Appellant] and [the complainant] Beck had drinks on the evening of December 21, 2014, to further make attempt at locating those persons to discern whether or not they recalled the evening and any interaction between [Appellant] and [the complainant] that night;

(c) Seek to identify or locate the Bartender, only known as "VLAD." who allegedly served drinks to [Appellant] and [the complainant, on December 21,2014, to discern whether or not he recalled the evening, the events of the evening or the interaction between [Appellant] and [the complainant] while in his presence on the subject date; and

(d) Seek or obtain the cellular telephone records of either [the complainant] or her then boyfriend Landers [Weakley], to investigate the nature of the communications between the two (2) persons both surrounding the time of the events and the communication between them subsequently thereto but prior to trial.

A defendant in a criminal case is entitled to reasonably effective assistance of counsel, including investigation of the defendant's case. *See Strickland*, 466 U.S. at 690–91. Part of the duty to investigate is counsel's responsibility to seek out and interview potential witnesses. *Butler v. State*, 716 S.W.2d 48, 55 (Tex. Crim. App. 1986) (quoting *Ex parte Lilly*, 656 S.W.2d 490, 493 (Tex. Crim. App. 1983)). To show ineffective assistance of counsel based on an uncalled witness, a defendant must show two things: (1) the witness would have been available to testify and (2) the witness' testimony would have been of some benefit to the defense. *Crawford v. State*, 355 S.W.3d 193, 199 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (citing *Ex parte White*, 160 S.W.3d 46, 52 (Tex. Crim. App. 2004)); *see also Pinkston v. State*, 744 S.W.2d 329, 332 (Tex. App.—Houston [1st Dist.] 1988, no

42

pet.) ("An attorney's failure to investigate or present witnesses will be a basis for establishing ineffective assistance of counsel only where it is shown that the witnesses would have been available and that the presentation of the evidence would have benefitted appellant."). To meet the availability requirement, proposed witnesses must testify or swear in an affidavit that they were available to testify at the defendant's trial. *See Ex Parte Ramirez*, 280 S.W.3d 848, 853 (Tex. Crim. App. 2007). Appellant has presented no evidence from any proposed witness who would have been available to testify at Appellant's trial much less demonstrated that the testimony would have benefitted the defense. *See Crawford*, 355 S.W.3d at 199.

In support of his ineffective assistance claim, Appellant argues his trial attorney also failed to investigate whether any video surveillance cameras recorded the interaction between Appellant and Beck. In support of his argument, he points to the affidavit of Raymond Moore, a private investigator for defense counsel. Moore stated in his affidavit that he located and interviewed some potential material fact witnesses who told him they were never approached by law enforcement. He also stated his investigation revealed that multiple businesses near the incident were outfitted with surveillance cameras whose recorded footage were not requested by law enforcement investigators or defense counsel. Moore's affidavit, however, does not indicate what any recording from those cameras might have depicted.

A conviction will not be reversed for a failure to investigate, unless the consequence of the failure is that the only viable defense available to the accused is not advanced. *Donald v. State*, 543 S.W.3d 466, 477 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (citing *McFarland v. State*, 928 S.W.2d 482, 501 (Tex. Crim. App. 1996)). Here, the issue of consent was hotly contested at trial. A review of the record reflects that Appellant's trial attorney vigorously advanced the defensive theory that the sexual intercourse between Appellant and Beck was consensual. He cross-examined the State's witnesses at length, and his cross-examination of Beck, during which he focused on alleged inconsistencies in her testimony, spans more than 115 pages of the reporter's record. Appellant was not deprived of a viable defense.

After reviewing the record in the light most favorable to the trial court's ruling, we hold the trial court did not abuse its discretion by denying Appellant's motion for new trial based on his trial attorney's failure to interview or call any witnesses during the guilt-innocence phase of trial or investigate whether any video surveillance cameras recorded the interaction between Appellant and Beck. We overrule Appellant's third issue.

### 3. Failure to Seek Forensic Examination

During discovery, the State provided trial counsel with a recording of Detective Johnson's interview of Beck. In his fourth point of error, Appellant contends he was denied effective assistance of counsel at the guilt-innocence stage of trial because his trial counsel failed to seek a forensic examination of the malfunctioning video/audio recording of Beck's interview.

While the State acknowledges that the recording, which was admitted at trial as State's Exhibit 8, contains several instances when the sound is not available, it notes the vast majority of the recording is audible and intelligible. Beck also provided testimony on cross-examination regarding one of the instances when the audio was not available. Appellant asserts trial counsel was aware of the glitches yet admitted in his affidavit that he did not seek a forensic examination of the recording to determine whether the recording had been tampered with or intentionally corrupted. Appellant argues trial counsel should have requested a continuance so he could hire an expert to investigate the malfunctions on the recording, render an opinion as to the cause, and possibly recover the missing audio.

Appellant has not proffered any expert witness who examined, or could have examined, State's Exhibit 8 to determine whether the audio issues could have been resolved. Nor has he provided any evidence that an examination of the recording would have been beneficial to Appellant's defense. *See Starr v. State*, __ S.W.3d

__, __, 2020 WL 4006447, at *6 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (mem. op., not designated for publication) (overruling defendant's ineffective assistance claim based on trial counsel's failure to present testimony of mental health expert where defendant presented no evidence mental health expert was available to testify or that expert's testimony would have been beneficial to defendant's defense). Without more, we cannot conclude trial counsel's performance was deficient for failing to seek a forensic examination of the recording. *See Thompson*, 9 S.W.3d at 813 (stating "[a]ny allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness"); *see also Starr*, 2020 WL 4006447, at *6.

We overrule Appellant's fourth point of error.

### 4. Extraneous Evidence

In his fifth point of error, Appellant contends the trial court erred in considering extraneous evidence outside the record at the hearing on his motion for new trial. He argues the trial judge should have permitted defense counsel at the hearing to inspect the evidence the judge considered or mark it as an exhibit.

As we already noted, we cannot consider the record of the new trial hearing because the trial court conducted the hearing after Appellant's motion was overruled by operation of law and the trial court's plenary power had expired. *See Moore*, 225 S.W.3d at 570; *Jackson*, 550 S.W.3d at 245. Because Appellant challenges only the

trial court's consideration of evidence at the hearing, he has presented nothing for our review. We overrule Appellant's fifth point of error.

## Conclusion

We affirm the trial court's judgment.


Veronica Rivas-Molloy
Justice

Panel consists of Justices Goodman, Rivas-Molloy, and Farris.

Do Not Publish. TEX. R. APP. P. 47.2(b).